IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| STACIE SCHLISNER, | ) | |
| | ) | |
| Plaintiff, | ) | 4:18CV3133 |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM** |
| NANCY BERRYHILL, Acting | ) | **AND ORDER** |
| Commissioner of the Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff Stacie Schlisner brings this action under Titles II and XVI of the Social Security Act, which provide for judicial review of "final decisions" of the Commissioner of the Social Security Administration. 42 U.S.C. § 405(g) (Westlaw 2019).

## I. NATURE OF ACTION & PRIOR PROCEEDINGS

### A. Procedural Background

Schlisner filed an application for disability benefits on February 19, 2015, under Titles II and XVI. The claims were denied initially and on reconsideration. Following an April 26, 2017, hearing, an administrative law judge ("ALJ") found on October 16, 2017, that Schlisner was not disabled as defined in the Social Security Act (Filing No. 16-2 at CM/ECF pp. 12-23). Following the five-step sequential analysis[1] for

---

[1] *See Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) ("During the five-step process, the ALJ considers (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the

determining whether an individual is "disabled" under the Social Security Act, 20 C.F.R. § 404.1520, the ALJ concluded in relevant part:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2019.

2. The claimant has not engaged in substantial gainful activity since June 6, 2014, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3. The claimant has the following severe impairments: residuals of lumbar spine surgery, obesity, asthma, mood disorder, anxiety (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(b) and 416.967(b) with additional postural and environmental limitations. The claimant is able to stoop, kneel, crouch, and crawl occasionally. She is able to perform work that allows her to stop working for about one minute every 30 minutes to stretch in order to increase her comfort. She is able to perform work that does [not][2] expose her to sustained and concentrated extreme temperatures, fumes, or dust. She is able to

---

criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work." (internal quotation marks and citation omitted)).

[2]The ALJ's fifth finding (Filing No. 16-2 at CM/ECF p. 17) erroneously omitted the word "not." (See ALJ's discussion of fifth finding, including the word "not," in Filing No. 16-2 at CM/ECF p. 20.)

perform work that does not require more than incidental and superficial social interaction.

      6.     The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

      7.     The claimant was born on July 5, 1978 and was 35 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

      8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

      9.     Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

      10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

      11.     The claimant has not been under a disability, as defined in the Social Security Act, from June 6, 2014, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Filing No. 16-2 at CM/ECF pp. 14-23 (intervening discussion and bold typeface deleted).)

On July 29, 2018, the Appeals Council of the Social Security Administration denied Schlisner's request for review. (Filing No. 16-2 at CM/ECF pp. 1-7.) Thus, the decision of the ALJ stands as the final decision of the Commissioner. *Sims v. Apfel*, 530 U.S. 103, 107 (2000) ("if . . . the Council denies the request for review, the ALJ's opinion becomes the final decision").

**B.**     **Issues on Appeal**

Schlisner asserts that the ALJ committed a litany of errors which, summarized and condensed, can be described as: (1) erroneously deciding that Schlisner does not have an impairment or combination of impairments that meets or medically equals the severity of Listing 1.04; (2) improperly weighing the opinions of Schlisner's treating physician; (3) failing to develop the record; (4) improperly assessing her RFC; and (5) posing an improper hypothetical question to the vocational expert ("VE"). (Filing No. 22 at CM/ECF p. 3.)

**C.**     **Statement of Medical Factual & Opinion Evidence**

The Plaintiff has set forth a Statement of Material Facts related to Schlisner's physical and mental impairments, with which the Defendant "generally concurs." (Filing No. 22 at CM/ECF pp. 4-9; Filing No. 26 at CM/ECF p. 2.)

> Stacie Schlisner is 40 years of age, having been born on July 5, 1978. She is a divorced mother of 4 children who at the time of trial ranged in age from 20 to 15. Claimant's vocational experience is largely in unskilled customer service/retail experience at a light exertional level. Ms. Schlisner has a history of severe physical and mental impairments including thoracic back pain (spondylosis, nerve root irritation, disc disease), lumbar pain/degenerative disc disease (disc bulge at L4-5 and L5-S1 with right paracentral disc protrusion at L5-S1), neck pain, major depressive disorder recurrent episodes severe, chronic rhinitis, chronic sinusitis, recurrent pneumonia, dyspnea/shortness of breath, COPD, obstructive sleep apnea, migraine headaches, adjustment disorder with anxiety, generalized anxiety disorder, dependent personality disorder, nausea, asthma, chronic urinary tract infections/urinary frequency, foot pain and plantar faciitis. She also noted daily fatigue impaired

concentration and focus, impaired memory, and poor/decreased sleep/insomnia.[3]

Treatment for her back pain has included non-steroidal anti-inflammatory medications, opioid analgesics, muscle relaxants, trigger point injections, physical therapy, electrical stimulation/TENS therapy, chiropractic treatment, thoracic and lumbar epidural steroid injections, orthopedic evaluation, and three back surgeries (including two that pre-dated her application filing which consisted of fusion at T8-T9 performed by Dr. McClellan and a lumbar spine surgery consisting of fusion/fixation of L4, L5 and S1 vertebral bodies[)].

Ms. Schlisner's chronic pain issues are long-standing and they affected her in the workplace. She worked for 14 years at Target stores, working herself up to a team lead, managing the floor but she left that job (on mutual agreement) due to her pain complaints. In July of 2014, prior to her filing for disability, and prior to ending her job with Target, Ms. Schisner's treating physician, Dr. Timothy Sullivan, noted that she "had a long history of chronic thoracic back pain" and she was "disabled partially from this." Dr. Sullivan indicated that she was utilizing narcotic pain medicines to manage her symptoms and he placed her on work restrictions of no more than 30 hours a week, 6 hours per day to avoid worsening pain or disc inflammation. Unfortunately, Ms. Schlisner's pain and problems only continued to worsen with time such that she was unable to perform the tasks required of her job in a consistent and reliable manner.

On October 13, 2014, Dr. Timothy Sullivan opined that Ms. Schlisner "has a disability as defined by the Social Security Act" and had "a severe, chronic disability which is attributable to a mental and/or physical impairment or combination of mental and physical impairments…is likely to continue indefinitely; and results in substantial functional limitations in three or more of the following areas of major life activity: self-care; receptive and responsive language; learning;

_____

[3]The many citations to the record in Plaintiff's Statement of Material Facts have been removed for ease of reading. The omitted citations may be viewed in Filing No. 22 at CM/ECF pp. 4-9.

mobility; self-direction; capacity for independent living; and economic self-sufficiency."

Dr. Sullivan referred Ms. Schlisner to numerous specialists to help manage her pain and limitations over the years [rheumatology, pulmonary, cardiology, dermatology, urology, nephrology, pain management, sleep study], yet her pain and problems persisted. On January 19, 2015, Dr. Sullivan noted that he continued to diagnose Ms. Schlisner with thoracic back pain, thoracic disc disease, asthma and fatigue. He noted her prognosis was poor and she was unable to work at that time. He further indicated that she was unable to do any lifting, she was unable to stand more than 1 to 2 hours, and must change positions often. Dr. Sullivan also indicate[d] that Ms. Schlisner's conditions adversely affected her cognition, thinking and physical abilities. Dr. Sullivan continued to help manage Ms. Schlisner's ongoing and chronic pain complaints. In a report dated March 8, 2015, he noted that Ms. Schlisner's impairments were expected to last at least twelve months. He noted that in an 8[-]hour working day (with normal breaks), Ms. Schlisner could only stand or walk 0-2 hours and could only sit 3 hours. He also noted that she would need a job that would permit her to shift positions at will from sitting, standing or walking, and that she had significant limitations with reaching, handling and fingering. Dr. Sullivan indicated that during a typical work day, Ms. Schlisner would frequently experience pain or symptoms severe enough [to] interfere with attention and concentration, and would likely be absent from work as a result of impairments more than four days per month. Dr. Sullivan again echoed those opinions in an office note dated April 7, 2015 wherein he said [Ms. Schlisner] is currently disabled from these medical illnesses. She is currently unable to work secondary to the medical illnesses and ongoing sequela to the medicines and illnesses.

Dr. Sullivan's opinions were then mirrored by her mental health provider, Patricia Lenz, APRN-NP in correspondence dated April 13, 2015. At that time, Nurse Lenz reported Ms. Schlisner was a patient in her office and it was her opinion that . . . "[d]ue to her depressive and anxiety symptoms, Stacie has been unable to maintain full-time employment."

In an office note dated October 13, 2015, Dr. Timothy Sullivan discussed Ms. Schlisner's active problems at that time as cough with dyspnea, and wheezing, along with urinary frequency, asthma, chronic lumbar pain, and thoracic spine pain. As to Ms. Schlisner's thoracic pain complaints, Dr. Sullivan noted that her symptoms included back pain, neck pain, lower extremity numbness, weakness, and paresthesias, urinary retention, urinary incontinence, and difficulty breathing. He noted her symptoms were exacerbated by sitting, standing, lifting, bending, twisting, overhead reaching, deep breathing, and coughing/sneezing. Dr. Sullivan described her current treatment as activity modification, opioid analgesics, muscle relaxants, and prescribed exercises. He stated, "she has had the thoracic back spasm for years and years," noting that "it really did not change much. We have tried many different modalities to help this. She has seen multiple specialists." In assessing that pain, Dr. Sullivan noted "She continues to be disabled from her back spasms, thoracic back pain and low back pain. She does not show any significant improvement. We talked about changing her pain medicines around. We talked about physical therapy…She continues to be disabled from her occupation and her rotation because of the back spasms, back pain, ongoing asthma and recurrent urinary tract infections. Therefore, we will continue to work with her with her medicines and her rehabilitation."

Ms. Schlisner's health condition has only deteriorated over time. Dr. Sullivan provided an update on October 21, 2015. At that time, he again noted he continued to see Ms. Schlisner monthly for her thoracic and low back pain, asthma, and recurrent UTIs. He again noted she could only stand or walk between 0 to 2 hours in a regular 8 hour work day, and could only sit up to 3 hours during that time. He also noted she would need a job that would allow her to shift positions at will and could only occasionally lift less than 10 pounds. Dr. Sullivan reported significant limitations in in [sic] fingering and noted that Ms. Schlisner's depression and anxiety affected her overall condition. He also indicated that in a typical work day, Ms. Schlisner's pain or other symptoms were severe enough to interfere **constantly** with the attention and concentration needed to perform even simple work tasks. As to the degree to which he believed Ms. Schlisner could tolerate work stress, Dr. Sullivan noted that she was "incapable of even 'low stress' jobs" given her persistent pain, asthma symptoms, muscle spasms, and wheezing. He also again

indicated that she would likely miss more than four days of work per month due to impairments or treatment.

In an office note dated January 4, 2016, Dr. Sullivan assessed Ms. Schlisner at that time as having 1) asthma 2) asthmatic bronchitis, mildly persistent, with acute exacerbation 3) GERD 4) history of chronic urinary tract infections 5) thoracic back pain 6) thoracic disc disease and 7) low back pain. He went on to state:

> Patient is currently disabled. Patient has a number of different medical illnesses that are disabling for her… She is currently unable to carry out regular employment because of her persistent pain and persistent debility from the back pain. This is complicated by the ongoing asthma which is generally persistent. She would be unable to stand for any length of time greater than 15-20 minutes and she would be unable to sit at the same place for 15-20 minutes without having frequent rest breaks for the spasticity. These appear to be a permanent fixture. We would recommend that she continue her current medicines and her current restrictions.

Dr. Diamant[] ordered Ms. Schisner to undergo an MRI of the lumbar spine on March 23, 2016. That exam revealed: 1) L3-4 diffuse disc protrusion with facet generative changes causing a mild acquired central canal stenosis with small neural foramina bilaterally 2) fusion of L4 to S1 with moderate amount of metallic artifact 3) trace fluid in the inferior central spinal cord consistent with minimal syringo-/hydromyelia and 4) mild atrophy of the left kidney with mild-to-moderate hydronephrosis.

At Dr. King's recommendation, Ms. Schlisner began seeing Melissa Quick, APRN on April 18, 2016 for evaluation of her anxiety and depression. She noted increased stress and had been seeing Dr. King twice a week for several months but continued to struggle with symptoms on a daily basis. Her mood was noted to be down, feeling sad, with negative thoughts and high irritability. She reported that she couldn't get out of bed, had to force herself to take her kids to school, didn't wanted to do anything at home, had difficulty with self[-]care, and taking a shower would take everything out of her. She also reported poor

concentration and that she had "no memory at all." Ms. Schlisner reported no interest or enjoyment, not even her kids, and had poor sleep. Ms. Schlisner also reported worse anxiety over the last 2-3 years, worrying that people were watching or judging her. She also had anxiety and worry about her kids, finances, and stuff that never bothered her before, reporting a history of panic attacks, more frequent in the last 6 months.

On October 20, 2016, Ms. Schlisner saw Melissa Quick, APRN for her ongoing depression and anxiety. Ms. Schlisner noted "doing poor," indicating she was having more pain as her medication had to be changed due to insurance. She reported having a lot of sadness, no energy or motivation, and getting easily upset some days. Ms. Schlisner said she was still isolating and felt no interest or enjoyment, felt frustrated with her situation and was more just down now, crying and having negative thoughts. Her appetite was noted to be poor, with poor concentration, and sleeping 2-3 hours in chunks on Xanax.

On November 23, 2016 Dr. Sullivan referred Ms. Schlisner to Dr. Kelly Zach at Innovative Pain and Spine Specialists. At that time, she noted a history of persistent mid and low back pain, noting 2 prior back surgeries (thoracic and lumbar fusions). She also noted previous treatment including chiropractic care, braces, nerve blocks, physical therapy, acupuncture, opioids, massage, psychological counseling, TENS unit, medications, multiple epidural injections, and a left L4 transforaminal epidural on 4/12/16. Despite those interventions, Ms. Schlisner continued to have pain. After exam, Dr. Zach assessed Ms. Schlisner as suffering from 1) failed back surgical syndrome 2) lumbar radiculopathy 3) history of lumbar fusion; and 4) thoracic myofascial strain, sequela. Dr. Zach recommended another course of gabapentin and meloxicam, as well as a left L3 transforaminal epidural at that time.

In a December 7, 2016 office note with Dr. Kelly Zach, Ms. Schlisner noted thoracic pain, low back pain and left[-]leg pain. Dr. Zach noted suspected facet arthropathy at the levels above her thoracic fusion due to increased stress. He felt that would be best treated with radiofrequency ablation after a local anesthetic block. He scheduled her for an epidural in the low back at L3 the following week.

On December 21, 2016, Ms. Schlisner followed up with Melissa Quick, APRN, at Genesis Psychiatric Group for evaluation and treatment of her anxiety and depression. At that time she noted taking gabapentin for her back pain which made her tired. She reported anxiety about being judged by others still prevented her from doing things in public and it was hard to leave the house at times. She also noted being nervous about activities and still not having a lot of motivation. She was noted to be sad with anxiety and a blunted affect.

On December 29, 2016, Ms. Schlisner underwent surgery in the form of lateral lumbar interbody fusion (XLIF), left side up at the lumbar 3-4 space, with removal of previous instrumented fusion, pedicle screws and rods, and a decompression laminectomy at L3-4, posterior lateral arthrodesis of lumbar 3-4 space at the superior aspect of the previous fusion.

Ms. Schlisner saw Dr. Kelly Zach on January 23, 2017 for continued medication management and follow up on her left L3 transforaminal epidural injection. It was noted that Ms. Schlisner had undergone surgery on 12/29/2016 to extend her lumbar fusion to L3. She continued to have pain in the thoracic region above the level of her T8-9 fusion but Dr. Zach wanted to wait to do facet joint injections until she was 6 weeks out from surgery. Dr. Zach noted that Ms. Schlisner was taking significant opioids and medications but her pain was constant with exacerbations occurring daily.

On February 1, 2017, Ms. Schlisner followed up with Dr. Kelly Zach's office for her opioid management. Dr. Zach noted that Ms. Schlisner had run into issues getting oxycodone due to quantity imposed by Medicaid, noting she was taking 4-5 oxycodone 10-324 mg daily, OxyContin 30 mg BID, 2700 mg of gabapentin daily, 15 mg meloxicam daily, and Flexeril PRN. Dr. Zach noted that she had reached the 150 quantity limit for short[-]acting opioids imposed by Medicaid as the pharmacy fill that quantity. Dr. Zach sent a refill for 20 pills to be filled that Friday with instructions that she needed to make them last as long as possible.

In an office visit with Melissa Quick, APRN, on February 1, 2017, Ms. Schlisner reported continued feelings of depression and anxiety. She continued to note social anxiety and avoiding things, having poor concentration, and not a lot of motivation. She was assessed as having a GAF score of 50 at that time.

Over the years, Ms. Schlisner was prescribed significant opioid/narcotic pain medication to help manage her pain complaints but they did not alleviate her symptoms. Additionally, they came with significant side effects including chronic constipation and abdominal pain. Additionally, medical records reflect that her "[m]edications and pain continue to exhaust her," and she "takes many daily naps due to pain and medications."

Her records also reflect difficulty with self-care such that she "needs help from daughter to step out of shower," she was unable to bend down and tie her shoes, she had continued difficulty entering and exiting her car, she couldn't vacuum or mop her kitchen floor, and she had been unable to sleep for the last several days, and is not able to stand up straight.

(Filing No. 22 at CM/ECF pp. 4-9 (bold in original).)

## II. STANDARD OF REVIEW

The court may reverse the Commissioner's findings only if they are not supported by substantial evidence or result from an error of law. *See Nash v. Comm'r, Soc. Sec. Admin.*, 907 F.3d 1086, 1089 (8th Cir. 2018); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").

Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." It means—and means only—"such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In determining whether evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. If substantial evidence supports the Commissioner's conclusion, the court may not reverse merely because substantial evidence also supports the contrary outcome and even if the court would have reached a different conclusion. *Nash*, 907 F.3d at 1089. The Eighth Circuit has repeatedly held that a court should "'defer heavily to the findings and conclusions of the Social Security Administration.'" *Wright v. Colvin*, 789 F.3d 847, 852 (8th Cir. 2015) (quoting *Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010)).

## III.  DISCUSSION

### <u>A.</u>      <u>Whether Impairment Meets Listing 1.04</u>

Schlisner asserts that the ALJ improperly decided that "[t]he requirements of listing 1.04 are not met because the claimant does not have nerve root compression, spinal arachnoiditis, or pseudoclaudication," with a specific finding that "the criteria of paragraph C have not been met, because the findings of medical imaging do not establish lumbar spinal stenosis, resulting in pseudoclaudication or compromise of a nerve root, and there is no evidence of chronic weakness and an inability to ambulate effectively." (Filing No. 16-2 at CM/ECF p. 15.)

The "Listing" referenced by the ALJ is contained in 20 C.F.R. Part 404, Subpart P, Appendix 1, Section 1.04 ("Disorders of the spine"), and, in relevant part,[4] states:

---

[4]Schlisner complains only about the ALJ's finding that paragraph (C) was not met. (Filing No. 22 at CM/ECF p. 14.)

**1.04**  Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

> . . . .

> C.  Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.[5]

In order to show that her impairment meets this Listing, Schlisner was required to show not only that her disorder is a condition "resulting in compromise of a nerve

---

[5]Section 1.00(B)(2)(b) defines the inability to ambulate effectively as "an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." The regulations further state:

> To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

root . . . or the spinal cord," but also that she meets the specific symptom and documentation requirement under subsection C.

Schlisner is correct that the ALJ erroneously found that the medical imaging did not show lumbar spinal stenosis because the record contains evidence of "mild acquired central canal stenosis" on a March 23, 2016, MRI. (Filing No. 17-3 at CM/ECF p. 89.) The ALJ was also mistaken in finding no lumbar spinal stenosis resulting in pseudoclaudication. (Filing No. 17-8 at CM/ECF p. 2 (1/2/17 progress notes from Bryan Medical Center showing diagnosis of "Lumbar 3-4 spinal stenosis above a previously fused L4 through S1. Patient had lumbar radiculopathy and neurogenic pseudoclaudication"; describing necessity of surgery to "stabilize the spine and decompress the cauda equina for her symptoms of neurogenic pseudoclaudication").)

However, while there may have been evidence of spinal stenosis resulting in pseudoclaudication, the ALJ did not find that such condition resulted in an "inability to ambulate effectively" within the meaning of the applicable regulations. 20 C.F.R. Part 404, Subpart P, Appendix 1, Section 1.04(C) (emphasis added); *McCoy v. Astrue*, 648 F.3d 605, 611-12 (8th Cir. 2011) ("Merely being diagnosed with a condition named in a listing and meeting some of the criteria will not qualify a claimant for presumptive disability under the listing."). As stated above, paragraph (C) of 20 C.F.R. Part 404, Subpart P, Appendix 1, Section 1.04, requires a showing of an "inability to ambulate effectively, as defined in 1.00B2b," which is "an extreme limitation of the ability to walk." While there is evidence that Schlisner cannot walk for more than one-half of a city block without using her TENS unit for pain, there is evidence that she can travel "without companion assistance to and from a place of . . . school" when she delivers her daughter to school by car, 20 C.F.R. Part 404, Subpart P, Appendix 1, Section 1.00(B)(2)(b)(2); she climbs steps at her home five times per week; she visits a chiropractor twice a week; and she attends her children's major school performances. Furthermore, Schlisner points to no evidence that she uses a walker, crutches, or canes for assistance in walking. (Filing No. 16-2 at CM/ECF pp.

56, 59-60, 62-63, 67-68.) Most telling—and contrary to the idea that Schlisner cannot effectively ambulate within the strict meaning of the regulations—many of Schlisner's progress notes from Dr. Sullivan and Innovative Pain & Spine Specialists shortly before Schlisner's April 2017 administrative hearing refer to her "normal," "non-ataxic," and "non-antalgic"[6] gait. (Filing No. 17-5 at CM/ECF p. 30 (2/1/17 progress notes); Filing No. 17-5 at CM/ECF p. 32 (1/23/17 progress notes); Filing No. 17-4 at CM/ECF p. 5 (1/18/17 progress notes); Filing No. 17-4 at CM/ECF p. 10 (12/19/16 progress notes); Filing No. 17-5 at CM/ECF p. 38 (12/7/16 progress notes); Filing No. 17-5 at CM/ECF p. 41 (11/23/16 progress notes); Filing No. 17-4 at CM/ECF p. 14 (10/3/16 progress notes).)

Therefore, ample evidence exists in the record to support the ALJ's conclusion that Schlisner's back condition was not an impairment meeting Listing 1.04 for "disorders of the spine." *Jones v. Astrue*, 619 F.3d 963, 969 (8th Cir. 2010) ("For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." (internal quotation marks and citation omitted)); *Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004) (to meet burden of proof, claimant must present medical findings equal in severity to all criteria of Listing; "If, after review, we find it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the decision of the Commissioner." (internal quotation marks and citation omitted)).

## B.    Failure to Properly Weigh Evidence

Schlisner next argues that the ALJ failed to give controlling weight to the opinions of her treating physician, Dr. Timothy Sullivan, and instead substituted his

---

[6]An ataxic gait is "an unsteady, uncoordinated walk, with a wide base and the feet thrown out, due to some form of ataxia." An antalgic gait is "a limp adopted so as to avoid pain on weight-bearing structures . . . characterized by a very short stance phase." Dorland's Illustrated Medical Dictionary at p. 753 (32nd ed.).

own opinions for those of Dr. Sullivan. An ALJ will give a treating physician's opinion controlling weight only if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with the other substantial evidence. *Myers v. Colvin*, 721 F.3d 521, 525 (8th Cir. 2013); *House v. Astrue*, 500 F.3d 741, 744 (8th Cir. 2007); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). "[A]n ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (internal quotation marks and citation omitted). The ALJ is free to reject the opinion of any physician when it is unsupported in the physician's own treatment notes or other evidence of record. *Myers*, 721 F.3d at 525; *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007); *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006).

An ALJ should weigh treating-physician opinions using factors such as the nature and extent of treatment; the degree to which relevant evidence supports the physician's opinion; consistency between the opinion and the record as a whole; whether the physician is a specialist in the area in which the opinion is based; and other factors that support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). "Whether granting 'a treating physician's opinion substantial or little weight,' *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000), the commissioner must 'always give good reasons . . . for the weight' she gives, 20 C.F.R. § 416.927(d)(2)." *Cline v. Colvin*, 771 F.3d 1098, 1103 (8th Cir. 2014).

Schlisner complains that the ALJ failed to give controlling weight to Dr. Sullivan's opinions that (1) she can lift a maximum of 10 pounds; (2) she is unable to work at all; (3) if she attempted to work, she would likely be absent from work more than four days per month; and (4) her symptoms were severe enough to interfere with her attention and concentration such that she could not perform even simple work tasks frequently. (Filing No. 22 at CM/ECF pp. 9-11; Filing No. 16-2 at CM/ECF p. 20.) Specifically, the ALJ assigned "some weight" to Dr. Sullivan's opinion that

Schlisner could lift no more than 10 pounds, but gave "little weight" to Sullivan's other opinions regarding Schlisner's inability to work at all, her predicted monthly work absences, and the severity of Schlisner's symptoms causing gaps in her attention span at work. (Filing No. 16-2 at CM/ECF p. 20.)

While the ALJ purported to give Dr. Sullivan's 10-pound weight-lifting limit "some weight" instead of "controlling weight," the ALJ obviously incorporated Dr. Sullivan's opinion into Schlisner's RFC, which classified Schlisner as being capable of "less than the full range of sedentary work." (Filing No. 16-2 at CM/ECF p. 20.) By definition, sedentary work "involves lifting no more than 10 pounds at a time." 20 C.F.R. § 404.1567(a). Therefore, Schlisner's argument that the ALJ failed to sufficiently weigh this opinion is without merit.

The ALJ properly gave little, if any, weight to Dr. Sullivan's opinion that Schlisner is "unable to work secondary to the medical illnesses and ongoing sequela to the medicines and illnesses" (Filing No. 17-1 at CM/ECF p. 38) because such opinion is a legal conclusion to be reached by the Commissioner. *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005) ("A medical source opinion that an applicant is 'disabled' or 'unable to work,' however, involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight"); *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004) (doctor's opinion "that [claimant's] problems would make it difficult for him to hold any significant employment" was "an inappropriate legal conclusion"); *Krogmeier v. Barnhart*, 294 F.3d 1019, 1023 (8th Cir. 2002) (a treating physician's "statements that a claimant could not be gainfully employed are not medical opinions but opinions on the application of the statute, a task assigned solely to the discretion of the [Commissioner]" (internal quotation marks and citations omitted)); *Titles II & XVI: Medical Source Opinions on Issues Reserved to the Commissioner*, SSR 96-5P, 1996 WL 374183 at *5 (S.S.A. July 2, 1996) (medical source's opinion that claimant is "unable to work" is administrative finding reserved to Commissioner).

The ALJ correctly disregarded Dr. Sullivan's opinion that if Schlisner attempted to work, she would likely be absent from work more than four days per month, because such opinion was completely unsupported by medical evidence or any discussion whatsoever; rather, Dr. Sullivan's opinion was simply a "check-the-box" answer to the request to "please estimate, on the average, how many days per month your patient is likely to be absent from work as a result of the impairments or treatment." (Filing No. 17-1 at CM/ECF pp. 4, 50.) *Anderson v. Astrue*, 696 F.3d 790, 793-94 (8th Cir. 2012) (holding conclusory checkbox form has little evidentiary value when it provides little or no elaboration and cites no medical evidence); *Wildman*, 596 F.3d at 964 (ALJ properly discounted physician's opinion as conclusory when it consisted of three checklist forms, cited no medical evidence, and provided "little to no elaboration"); *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (ALJ properly discounted physician's medical source statement because statement contained limitations that "stand alone," did not exist in physician's treatment notes, and were not corroborated through objective medical testing).

Finally, the ALJ properly assigned little weight to Dr. Sullivan's opinion that Schlisner's symptoms were severe enough to interfere with her attention and concentration such that she could not perform even simple work tasks frequently. From March 17, 2015, to May 23, 2016, all of Dr. Sullivan's progress notes from Schlisner's examinations that included a neurologic assessment indicate that Schlisner was "alert and oriented x 3 with no impairment of recent or remote memory, normal attention span and ability to concentrate." (Filing No. 16-9 at CM/ECF p. 16 (3/17/15 progress notes); Filing No. 17-1 at CM/ECF p. 37 (4/11/15 progress notes); Filing No. 17-4 at CM/ECF p. 10 (12/19/15 progress notes); Filing No. 17-4 at CM/ECF p. 53 (5/11/16 progress notes); Filing No. 17-4 at CM/ECF p. 50 (5/23/16 progress notes).) In direct contrast, and without explanation, Dr. Sullivan's October 21, 2015, and March 18, 2015, medical-source statements conclude that Schlisner's "experience of pain or other symptoms" were either constantly or frequently "severe enough to interfere with attention and concentration needed to perform even simple work tasks." (Filing No. 17-1 at CM/ECF pp. 4, 50.) "It is permissible for an ALJ to discount an

opinion of a treating physician that is inconsistent with the physician's clinical treatment notes." *Davidson v. Astrue*, 578 F.3d 838, 843 (8th Cir. 2009); *see also Aguiniga v. Colvin*, 833 F.3d 896, 902 (8th Cir. 2016) ("an ALJ may discount a treating source opinion that is unsupported by treatment notes"); *Martise v. Astrue*, 641 F.3d 909, 926 (8th Cir. 2011) ("When a treating physician's notes are inconsistent with his opinion, the Court may decline to give controlling weight to that opinion.").[7]

Therefore, I conclude that the ALJ considered the record as a whole and properly gave less than controlling weight to the opinions of Schlisner's treating physician, Dr. Sullivan.

**C.    Failure to Develop the Record**

Schlisner next contends that the ALJ erred in failing to order a consultative examination; order a psychological examination; reopen her prior claim file; and seek "an updated opinion by a medical advisor given the complicated medical issues involved, Claimant's subsequent third back surgery, and the addition of over 530 pages of medical records added between the time that the State agency medical consultants reviewed this case and the date of hearing." (Filing No. 22 at CM/ECF p. 3.)

---

[7]Schlisner points to other evidence in the record dealing with her alleged lack of concentration and attention. (Filing No. 22 at CM/ECF p. 11.) Apparently, Plaintiff asks this court to reweigh the evidence, which it may not do. *See Igo v. Colvin*, 839 F.3d 724, 730 (8th Cir. 2016) ("we consider all of the evidence that was before the ALJ, but we do not re-weigh the evidence" (internal quotation marks and citation omitted)); *see also Fentress v. Berryhill*, 854 F.3d 1016, 1021 (8th Cir. 2017) (stating it is not surprising claimant can point to some evidence detracting from ALJ's decision, but the court does not reverse simply because it could have reached a different conclusion).

## 1.    Consultative Examination

Schlisner proclaims—without discussion, detail, analysis, or rationale—that the ALJ erred in not ordering "a consultative examination" in this case to the extent the ALJ questioned the existence of the Claimant's diagnosed condition. (Filing No. 22 at CM/ECF pp. 14-15.) This court will not disturb the Commissioner's failure to order such an examination in the absence of a discussion of reasons to do so. *Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005) (rejecting claimant's "listing" argument because "[the claimant] provides no analysis of the relevant law or facts regarding these listings"); *see also Aulston v. Astrue*, 277 F. App'x 663, 664 (8th Cir. 2008) (unpublished) (declining to consider social-security claimant's "undeveloped" argument that she met requirements of Listing and considering such argument waived); *Michael S. v. Berryhill*, No. 17-CV-5586, 2019 WL 1430138, at *9 (D. Minn. Mar. 29, 2019) (when social-security claimant did not give reason for assertion that ALJ improperly assessed consultants' opinions, court would not consider argument because "[u]ndeveloped arguments such as this are waived").

## 2.    Psychological Examination

Schlisner next argues that 42 U.S.C. § 421(h) dictates that disability determinations "shall not be made until the Commissioner of Social Security has made every reasonable effort to ensure—(1) in any case where there is evidence which indicates the existence of a mental impairment, that a qualified psychiatrist or psychologist has completed the medical portion of the case review and any applicable residual functional capacity assessment . . . . ," and the ALJ failed to order such a psychological examination here. (Filing No. 22 at CM/ECF pp. 15-16.)

"It is true that an ALJ has a duty to develop the record fully." *Haley v. Massanari*, 258 F.3d 742, 749 (8th Cir. 2001). In fact, "[i]t is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision." *Id*. (internal quotation marks and citation

omitted); *see also* 20 C.F.R. § 404.1519a (Social Security Administration will purchase consultative examination "[i]f we cannot get the information we need from your medical sources" in order to "resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow us to make a determination or decision on your claim").

Here, the ALJ thoroughly considered and discussed—as well as incorporated into Schlisner's RFC—her mental impairments. The ALJ first considered the severity of Schlisner's mental impairments in his step-three "Listing" analysis, including whether Schlisner was limited in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. (Filing No. 16-2 at CM/ECF pp. 15-16.) In the course of his RFC analysis, the ALJ also discussed Schlisner's treatment for depression and anxiety, her symptoms, and her prescribed medications for these conditions. (Filing No. 16-2 at CM/ECF p. 19.) In analyzing Schlisner's mental impairments, the ALJ cited and considered evidence from Dr. Sarah C. King (Filing No. 17-9 at CM/ECF pp. 47-59 (office treatment records from 2/16/16 to 6/9/17 from King Behavioral Health, LLC); Genesis Psychiatric Group (Filing No. 17-6 at CM/ECF pp. 1-54 (office treatment records from 4/18/16 to 3/8/17)); Coddington Medical Family Practice (Filing No. 17-4 at CM/ECF p. 4 (1/18/17 progress notes showing active prescriptions for depression and anxiety)); state-agency psychological non-examiners (Filing No. 16-3 at CM/ECF pp. 1-15, 16-29, 34-61); Patricia Lenz, APRN-NP (Filing No. 17-1 at CM/ECF p. 5); and Trisha Jobman, APRN-NP (Filing No. 17-1 at CM/ECF pp. 6-14).

Because the ALJ considered and analyzed several treatment and progress notes, evaluations, and medication records from multiple sources regarding Schlisner's psychological impairments sufficient for the ALJ to make an informed decision, it was unnecessary to order a consultative psychological examination, and the ALJ did not err in failing to do so.

### **3.**    **Prior Claim File**

Schlisner argues that the ALJ should have obtained her "prior claim file" because it "was necessary to help establish a longitudinal medical, vocation, and educational history, and to help establish disability in the present claim." (Filing No. 22 at CM/ECF p. 16.) Schlisner fails to explain precisely how her prior claim file was relevant or necessary to resolve her current claim—especially in the face of a 1216-page record—and the court declines to craft Schlisner's argument for her. Schlisner has waived this argument, and the court shall not further consider it. *Vandenboom*, 421 F.3d at 750 (rejecting claimant's argument for failure to analyze relevant law and facts); *see also Aulston*, 277 F. App'x at 664 (unpublished) (declining to consider "undeveloped" argument and considering such argument waived); *Michael S.*, 2019 WL 1430138, at *9 ("[u]ndeveloped arguments . . . are waived").

### **4.**    **Additional Opinion by Medical Advisor**

Schlisher contends that the ALJ should have "call[ed] a medical advisor to the hearing" because of 530 pages of medical records that were added to the administrative record between the time the state-agency medical consultants reviewed this case and the date of the hearing, including records of Schlisner's third back surgery. (Filing No. 22 at CM/ECF p. 18.)

A deficiency in the medical records reviewed by a consulting physician simply goes to the weight to be given to the consultant's resulting opinion. "[T]he opinion of a nonexamining consulting physician is afforded less weight if the consulting physician did not have access to relevant medical records . . . ." *McCoy v. Astrue*, 648 F.3d 605, 616 (8th Cir. 2011); *Wildman*, 596 F.3d at 967 (when evaluating non-examining source's opinion, ALJ must evaluate degree to which opinion considered all of the evidence pertinent to the claim, including opinions of treating sources); 20 C.F.R. § 404.1527(c)(3) (the weight given to opinions of nonexamining sources depends upon "the degree to which these medical opinions consider all of the pertinent

evidence in your claim, including medical opinions of treating and other examining sources").

Here, the ALJ was well aware the agency physicians did not have access to additional medical records and therefore properly gave only "some weight" to their opinions, stating that "[t]o the extent the residual functional capacity varies from the initial and reconsideration opinions, the variation is attributable to additional evidence, including the claimant's hearing testimony, which was not available to the non-examiners." (Filing No. 16-2 at CM/ECF p. 21.) Therefore, the ALJ properly accounted for the fact that the agency physicians did not consider the additional medical records about which Schlisner is concerned, and I am not persuaded by her argument otherwise.

## D.     Failure to Properly Assess RFC

Schlisner complains that the ALJ's RFC determination was erroneous because: (1) the ALJ's finding that Schlisner could sit for 30 minutes and then stand to stretch for one minute before resuming work is not supported by the record; (2) the ALJ failed to evaluate Schlisner's mental impairments in terms of work-related functions; (3) the ALJ misrepresented the evidence regarding Schlisner's follow-through with treatment for anxiety and depression; and (4) the ALJ failed to consider the opinion of Patricia Lenz, APRN-NP, that Schlisner's depression and anxiety symptoms rendered her unable to maintain full-time employment. (Filing No. 22 at pp. 12-14, 18-19.) I find that all of Schlisner's assigned errors with regard to the RFC are without merit.

### 1.     Stretching Limitation

Schlisner argues that "the ALJ's finding that Claimant could sit for half hour and then stand to stretch for one minute before resuming work is simply not supported by the record." (Filing No. 22 at CM/ECF p. 13.) In short, Schlisner misrepresents the

ALJ's RFC. The RFC says nothing about sitting for 30 minutes; rather, the RFC states, "She is able to perform work that allows her to stop working for about one minute every 30 minutes to stretch in order to increase her comfort." (Filing No. 16-2 at CM/ECF p. 17.) That is, whether Schlisner sits or stands while performing sedentary work, she would have "the freedom to stand up for about one minute every 30 minutes during the workday, and . . . that during this one minute, the worker is not productive at all. The worker would be free to stretch, . . . flex muscles, joints, whatever . . . ." (Filing No. 16-2 at CM/ECF p. 75 (ALJ's colloquy with VE; also confirming that claimant could perform sedentary jobs from standing position "if they choose to do so").)[8]

To the extent Schlisner is suggesting that the ALJ erred in not adopting the portion of Dr. Sullivan's medical source statements opining that Schlisner could stand/walk for up to two hours and sit for up to three hours in an eight-hour workday (Filing No. 17-1 at CM/ECF pp. 3 (3/18/2015), 49 (10/21/15))—the ALJ was bound to consider the record as a whole in developing Schlisner's RFC, not just the opinions of her treating physician. *Grable v. Colvin*, 770 F.3d 1196, 1201 (8th Cir. 2014) (a physician's opinion does not automatically control); *Wildman*, 596 F.3d at 969 (when finding a plaintiff's RFC, the ALJ evaluates the record as a whole, including the plaintiff's own testimony regarding his symptoms and limitations, the plaintiff's medical records, and any medical opinion evidence); *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007) (ALJ's RFC is not limited to medical evidence exclusively); *Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004) (a physician's opinion "does not automatically control or obviate the need to evaluate the record as a whole"). Part of that "record as a whole" were the opinions of state-agency non-examining physicians

---

[8]This freedom to choose whether to sit or stand between stretching breaks is not contrary to Dr. Sullivan's January 4, 2016, office note which states that Schlisner is "unable to stand for any length of time greater than 15-20 minutes and she would be unable to sit at the same place for 15-20 minutes without having frequent breaks . . . ." (Filing No. 17-5 at CM/ECF p. 7.)

who gave Dr. Sullivan's January 19, 2015, functional-capacity opinion that Schlisner is "[u]nable to work at this time" (Filing No. 16-11 at CM/ECF p. 85) limited weight because it was "more limiting than would be expected given the available objective evidence," "[t]he opinion relies heavily on the subjective report of symptoms and limitations provided by the individual," "the totality of the evidence does not support the opinion," and "[t]he opinion contains inconsistencies, rendering it less persuasive." These non-examining physicians, to which the ALJ assigned "some weight," also found that Schlisner could stand/walk six hours in an eight-hour work day and could sit for six hours in an eight-hour work day. (Filing No. 16-3 at CM/ECF pp. 9-10, 23-24, 27, 41-42, 45, 55-56, 59.)

In any event, Dr. Sullivan's opinions regarding the hours per day Schlisner could stand, walk, and sit suffer from the same defects as his opinion that Schlisner would likely be absent from work more than four days per month—that is, his opinion was simply a check-the-box estimate unsupported by medical evidence or any discussion whatsoever. (Filing No. 17-1 at CM/ECF pp. 3, 49.) *Anderson*, 696 F.3d at 793-94 (conclusory checkbox form has little evidentiary value when it provides little or no elaboration and cites no medical evidence); *Wildman*, 596 F.3d at 964 (ALJ properly discounted physician's opinion as conclusory when it consisted of three checklist forms, cited no medical evidence, and provided "little to no elaboration"); *Hogan*, 239 F.3d at 961 (ALJ properly discounted physician's medical source statement because statement contained limitations that "stand alone," did not exist in physician's treatment notes, and were not corroborated through objective medical testing).

## 2. Effects of Mental Impairments on Work-Related Functions

Schlisner maintains that the ALJ erroneously failed to evaluate her mental impairments in terms of work-related functions. This is simply untrue. At step three of his analysis, the ALJ thoroughly discussed how Schlisner's mental impairments affected four areas of functioning: understanding, remembering, or applying

information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing herself. (Filing No. 16-2 at CM/ECF pp. 15-16.) At steps four and five, the ALJ further evaluated Schlisner's mental residual functional capacity, citing evidence from psychologists and physicians relevant to her mental limitations. (Filing No. 16-2 at CM/ECF pp. 19, 21.)

### 3. Evidence Regarding Treatment Follow-Through

Next, Schlisner submits that the ALJ misrepresented the evidence regarding Schlisner's treatment for anxiety and depression when the ALJ stated that Schlisner cancelled eight therapy sessions with Dr. Sarah C. King, Ph.D., stopped therapy with King because of upcoming back surgery, did not schedule further appointments with King, and did not indicate at the hearing that she was seeking psychological therapy. (Filing No. 16-2 at CM/ECF p. 19.) Schlisner complains that the ALJ's characterization of her therapy created a false impression because, in fact, Schlisner cancelled her appointments with King to seek "treatment with a different provider, namely Melissa Quick, APRN at Genesis Psychiatric Group, a provider she had previously treated with." (Filing No. 22 at CM/ECF p. 19.)

While the ALJ may have erroneously failed to expressly mention Schlisner's treatment with Melissa Quick using Quick's name, the ALJ cited numerous records from Quick's practice (Filing No. 17-6 at CM/ECF pp. 1-54 (Genesis Psychiatric Group treatment records from 4/18/16 to 3/8/17); Filing No. 16-2 at CM/ECF p. 19 (ALJ's opinion repeatedly citing Genesis treatment records at Ex. 22F and noting that "the objective evidence of record documents diagnoses for . . . depression and anxiety" as well as active prescriptions for related medication)). The ALJ obviously considered such evidence regarding Schlisner's psychological impairments because he included within Schlisner's RFC her ability "to perform work that does not require more than incidental and superficial social interaction" due to her anxiety and depression. (Filing No. 16-2 at CM/ECF pp. 17, 20.) *See, e.g., Harvey v. Colvin*, 839 F.3d 714, 717 (8th Cir. 2016) (there was no merit to claimant's argument that RFC

failed to properly incorporate examining doctors' observations about slow pace when ALJ considered and accounted for such limitation by limiting RFC to simple, repetitive, and routine tasks and finding that claimant could not pay close attention to detail or use independent judgment); *Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004) (ALJ's decision should not be set aside based on an arguable deficiency in opinion-writing technique when it is unlikely that it affected the outcome); *Sneller v. Colvin*, No. C12-4113, 2013 WL 5969662, at *9 (N.D. Iowa Nov. 7, 2013), *report and recommendation adopted*, No. C 12-4113, 2014 WL 855618 (N.D. Iowa Mar. 5, 2014) (although ALJ failed to discuss opinion of state-agency consultant, the limitations included in the RFC were nearly identical to those identified by state-agency consultant, so court would not remand "so the ALJ can simply state what is obvious from his decision and the record").

### 4.  Opinion of Patricia Lenz, APRN-NP

Schlisner next argues that the ALJ failed to consider the opinion of Patricia Lenz, APRN-NP, that Schlisner's depression and anxiety symptoms rendered her unable to maintain full-time employment. Contrary to Schlisner's assertion, the ALJ *did* consider the opinion of Patricia Lenz, APRN-NP, who stated by letter on April 13, 2015—without any explanation or discussion—that "[d]ue to her depressive and anxiety symptoms, [Schlisner] has been unable to maintain full-time employment." (Filing No. 17-1 at CM/ECF p. 5.) The ALJ recognized that Ms. Lenz was a certified nurse practitioner who treated Schlisner, but he correctly gave the opinion little weight because it lacked functional work-related restrictions or limitations. (Filing No. 16-2 at CM/ECF p. 21.) *Piepgras v. Chater*, 76 F.3d 233, 236 (8th Cir. 1996) (opinions that contain no specifics concerning social-security claimant's condition are of limited value due to their vagueness); *see also Wildman*, 596 F.3d at 964 ("'[a] treating physician's opinion deserves no greater respect than any other physician's opinion when [it] consists of nothing more than vague, conclusory statements'" (quoting *Piepgras*, 76 F.3d at 236)).

Lenz's opinion was not only vague, but concerned an issue reserved to the Commissioner—employability. *See Davidson*, 578 F.3d at 842 (doctor's statement that claimant was disabled was statement on an issue solely reserved to Commissioner); *Vandenboom*, 421 F.3d at 750 (opinions on issues reserved to Commissioner are not entitled to controlling weight).

## E.    Failure to Pose Proper Hypothetical Question

Finally, Schlisner argues that the ALJ erred in not including in his hypothetical questions to the VE Dr. Sullivan's opinions that she must have a job that allows her to shift "at will" and that would never require her to stoop.[9] (Filing No. 17-1 at CM/ECF pp. 3, 49.) As with other of Dr. Sullivan's opinions discussed above, these opinions are found on a check-the-box form unsupported by medical evidence or any discussion whatsoever. (Filing No. 17-1 at CM/ECF pp. 3, 49.) *Anderson*, 696 F.3d at 793-94 (conclusory checkbox form has little evidentiary value when it provides little or no elaboration and cites no medical evidence); *Wildman*, 596 F.3d at 964 (ALJ properly discounted physician's opinion as conclusory when it consisted of three checklist forms, cited no medical evidence, and provided "little to no elaboration"); *Hogan*, 239 F.3d at 961 (ALJ properly discounted physician's medical source statement because statement contained limitations that "stand alone," did not exist in physician's treatment notes, and were not corroborated through objective medical testing). Thus, the ALJ was not required to include these opinions in his hypothetical question to the VE. *Perkins v. Astrue*, 648 F.3d 892, 902 (8th Cir. 2011) (ALJ "may

---

[9]Schlisner also submits that the ALJ should have included in his hypothetical questions to the VE Dr. Sullivan's opinions that Schlisner could only sit for three hours and stand for two hours in an eight-hour workday and that Schlisner would be absent from work a certain number of days each month. I have already decided above that the ALJ was not bound to give these opinions controlling weight, and "[t]he ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole." *Martise*, 641 F.3d at 926 (internal quotation marks and citation omitted).

exclude any alleged impairments that [he] has properly rejected as . . . unsubstantiated" (internal quotation marks and citation omitted)); *Martise*, 641 F.3d at 926 ("The ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole." (internal quotation marks and citation omitted)).

Schlisner appears to argue that the ALJ should have incorporated into his hypothetical question to the VE Schlisner's testimony that from 9:00 a.m. to 5:00 p.m. on an average day, she spends "at least six hours laying down." (Filing No. 16-2 at CM/ECF p. 57.) The ALJ explicitly weighed the objective and opinion evidence against Schlisner's alleged limitations and opined that "the claimant reports activities that are not limited to the extent one would expect in light of her allegations of disabling pain, and physical and mental limitations," noting that Schlisner lives independently with her four children, is able to "ambulate effectively," climbs stairs several times a week in her home, drives short distances to the pharmacy and chiropractor a few times each week, attends her children's major school performances, and drives one of her children to college each day. (Filing No. 16-2 at CM/ECF p. 19.)

In short, the ALJ was not bound to include in his hypothetical questions to the VE Schlisner's opinion of her own limitations when that opinion was contradicted by other evidence in the record. *Buckner v. Astrue*, 646 F.3d 549, 561 (8th Cir. 2011) ("[A]n ALJ may omit alleged impairments from a hypothetical question posed to a vocational expert when . . . the record does not support the claimant's contention that his impairments significantly restricted his ability to perform gainful employment." (internal quotation marks and citations omitted)); *Guilliams v. Barnhart*, 393 F.3d 798, 804 (8th Cir. 2005) ("Discredited complaints of pain . . . are properly excluded from a hypothetical question so long as the ALJ had reason to discredit them."); *Harvey v. Barnhart*, 368 F.3d 1013, 1016 (8th Cir. 2004) ("The fact that the ALJ omitted from his hypothetical questions those aspects of [the claimant's] subjective complaints that the ALJ considered non-credible does not render the questions faulty.")

# IV.  CONCLUSION

The ALJ's decision was supported by substantial evidence on the record as a whole and shall be affirmed.

IT IS ORDERED:

1.      Plaintiff's Motion for Order Reversing Prior Decision and Awarding Benefits (Filing No. 21) is denied.

2.      Defendant's Motion to Affirm Commissioner's Decision (Filing No. 25) is granted.

3.      The Commissioner's decision is affirmed pursuant to sentence four of 42 U.S.C. § 405(g).

4.      Judgment will be entered by separate document.

DATED this 3rd day of July, 2019.

BY THE COURT:

s/ *Richard G. Kopf*
Senior United States District Judge
